FILED
11/19/26 5:17 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE:** | ) | **Bankr. No. 25-70506-JAD** |
| **DAVID B. WILSON,** | ) | **Chapter 7** |
| **Debtor.** | ) | |
| | X | |
| **ESTATE OF MAKENZIE DEDITCH, AND ESTATE OF WILLARD ALLSHOUSE, JR.,** | ) | |
| | ) | **Related to ECF No. 53** |
| **Movants,** | ) | |
| **-v-** | ) | |
| **DAVID B. WILSON,** | ) | |
| **Respondent.** | ) | |
| | X | |

**MEMORANDUM OPINION**

Before the Court is the Plaintiffs' motion to dismiss the Chapter 7 bankruptcy case of David B. Wilson ("Wilson" or the "Debtor") for cause under 11 U.S.C. § 707(a). *Motion to Dismiss Case Pur[su]ant to 11 U.S.C. 707(a)* ("Motion"), ECF No. 53. The Court has jurisdiction to hear and decide the Motion pursuant to 28 U.S.C. §§ 1334 and 157 and the standing order of reference of the United States District Court for the Western District of Pennsylvania, and authority to enter a final order because the matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A).

Wilson is a physician who commenced this Chapter 7 case approximately two months before the scheduled trial of wrongful death and survival actions arising from an automobile accident that claimed the lives of Makenzie Deditch

and Willard Allshouse, Jr. The estates prosecuting those actions (collectively, the "Plaintiffs") seek dismissal of this bankruptcy case. Although Wilson disputes liability, the parties acknowledge that an adverse judgment likely would exceed one million dollars. Wilson also earns substantial income and possesses considerable capacity to satisfy creditor claims from future earnings.

The Plaintiffs contend that Wilson's substantial income, the timing of his bankruptcy filing, the concentration of his indebtedness in the pending tort claims, and his election to proceed under Chapter 7 demonstrate that the petition was filed in bad faith, warranting dismissal under § 707(a). Wilson disputes that characterization and maintains that he is entitled to seek relief under Chapter 7 notwithstanding his income and the pendency of the state-court litigation. *Response of the Debtor in Opposition to the Motion of the Estate of Makenzie Deditch and the Estate of Willard Allshouse to Dismiss Case Pursuant to 11 U.S.C. § 707(a)* ("Response to Motion"), ECF No. 56. In light of Wilson's substantial earning capacity, the Court also directed the parties, sua sponte, to address whether § 707(b), including its statutory means test, applies to this case.

The circumstances presented are deeply troubling. Two individuals lost their lives, their families have pursued legal remedies for years, and Wilson, despite his substantial earning capacity, seeks to discharge potentially significant tort liabilities while generally retaining his postpetition earnings. The prospect that a debtor with the financial means to make meaningful payments toward such claims may nevertheless obtain a discharge without doing so raises serious concerns about the equitable consequences of the relief sought.

Those concerns, however, do not relieve the Court of its obligation to apply the law as written by Congress and interpreted by the Court of Appeals for the Third Circuit. Under controlling precedent, a debtor's ability to repay creditors, although relevant to the good-faith inquiry under § 707(a), does not alone constitute cause for dismissal. Moreover, Congress expressly limited the abuse provisions of § 707(b), including the means test, to individuals whose debts are primarily consumer debts. As explained below, the Court concludes that Wilson's obligations do not satisfy that statutory threshold. Thus, notwithstanding the substantial equitable concerns presented, neither § 707(a) nor § 707(b) provides a basis for dismissal on this record. Accordingly, the Motion will be denied.

## I. FACTS AND PROCEDURAL HISTORY

On December 3, 2025, approximately two months before the scheduled trial, Wilson filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code. Chapter 7 Voluntary Petition ("Petition"), ECF No. 1. The filing triggered the automatic stay under 11 U.S.C. § 362(a), preventing the state-court litigation from proceeding against him absent relief from the stay.

Wilson's bankruptcy schedules identify a remarkably limited creditor universe. Apart from a mortgage obligation, his principal potential liabilities arise from the wrongful death and survival claims. At the hearing on the Motion, counsel also identified a relatively small credit-card obligation that Wilson had satisfied before filing bankruptcy, and the parties agreed that the payment was de minimis.

In his Petition, Wilson represented that his debts were not primarily consumer debts. Id. at 6. Although the Petition characterized his obligations as primarily business debts, the principal disputed claims arise from the automobile accident, which occurred while Wilson was engaged in personal travel rather than activities related to his medical practice. Id. at 19–20.

Wilson filed the schedules and statements required by the Bankruptcy Code and subsequently amended certain disclosures. See First Amended Schedules, ECF No. 18; Second Amended Schedules, ECF No. 25. The Chapter 7 Trustee adjourned the initial meeting of creditors to permit the submission of amended schedules, a statement of financial affairs, and related information. The meeting of creditors ultimately was completed on April 8, 2026.

The amended schedules disclose substantial income. Schedule I reflects combined monthly household income of approximately $28,915.67, including approximately $24,878.64 attributable to Wilson. First Amended Schedules 5–6. The parties did not materially dispute the accuracy of the amended income and expense schedules, although counsel expressed some uncertainty during the hearing concerning the calculation of Wilson's net income after expenses.

Wilson's financial disclosures also reflect various assets, including his residence, vehicles, bank accounts, and other financial accounts. His residence was reported to have a value of approximately $275,000 and to be owned jointly with his nondebtor spouse, subject to a mortgage. Second Amended Schedules 3. The record further reflects that Wilson maintained financial accounts containing funds aggregating $186,178.66 at the commencement of the case,

consisting of two checking accounts totaling $75,638.76, two savings accounts totaling $54,383.26, and a certificate of deposit with a value of $56,156.64, all of which are held with InFirst Bank. Petition 13.

The Chapter 7 Trustee determined that Wilson’s estate contained assets available for administration and investigated his claimed exemptions. In particular, Wilson initially claimed an exemption in an account valued at approximately $108,000 that had been identified as an individual retirement account. The Trustee objected to the exemption, and the Court sustained the objection by order dated May 28, 2026. *Default Order Granting Objection to Debtor’s Claim of Exemptions as Amended*, ECF. No. 51.

The Plaintiffs filed the Motion seeking dismissal of Wilson's Chapter 7 case for cause under 11 U.S.C. § 707(a), asserting that his Petition was filed in bad faith. They principally rely upon his substantial income and ability to repay creditors, the concentration of his indebtedness in the pending tort claims, the proximity of his bankruptcy filing to the scheduled state-court trial, and his decision to seek relief under Chapter 7 rather than a chapter contemplating repayment from future earnings.

Wilson opposes dismissal. He maintains that the pending litigation exposes him to potentially substantial liability, that his election to proceed under Chapter 7 is authorized by the Bankruptcy Code, and that his substantial income does not independently establish bad faith. He also relies upon his financial disclosures, cooperation with the Trustee, and surrender of nonexempt assets for creditor distribution. Response to Motion ¶¶ 16, 30, 39.

The Court conducted a hearing on the Motion on July 7, 2026. Transcript Regarding Hearing Held July 7, 2026 ("H'rg Transcript"), ECF No. 69. Counsel appeared on behalf of the Plaintiffs, Wilson, and Chapter 7 Trustee Lisa M. Swope. During the hearing, the Court had a colloquy with counsel concerning the circumstances of Wilson's filing, his financial affairs, the nature of the pending claims, and the existence of any disputed facts requiring an evidentiary hearing.

At the hearing, Wilson's counsel acknowledged that the account did not qualify for the claimed exemption and represented that Wilson had authorized its liquidation for the benefit of creditors. Id. at 11:11–12:20. Counsel further represented that the financial institution was in the process of issuing payment to the Trustee. Id. Thus, this is an asset case in which the Trustee is administering property for distribution to creditors.

The parties also addressed discrepancies between Wilson's original and amended financial disclosures. The Plaintiffs asserted that the initial schedules omitted certain personal property and financial information that was subsequently disclosed through amendments. Id. at 41:2–42:23. Wilson's counsel disputed the characterization that substantial assets had been concealed and explained that the amendments resulted from efforts to clarify the nature of certain accounts and provide additional information, including payments made for the benefit of Wilson's parents. Id.

The Trustee's counsel confirmed that Wilson had been honest and forthcoming during the meeting of creditors. Id. at 39:25–40:3. Although the

Plaintiffs questioned the relationship between Wilson's substantial income and the funds reflected in his accounts, they did not identify evidence establishing concealment of income, fraudulent transfers, artificially inflated expenses, or the maintenance of an extravagant lifestyle. Id. at 39:19–40:10.

Wilson's counsel also described circumstances affecting his financial obligations and future earning capacity. Wilson is approximately sixty years old and practices orthopedic surgery, which counsel characterized as physically demanding. Id. at 24:2–13, 26:23–27:2. Counsel further represented that Wilson is obligated under a divorce settlement to pay approximately $11,000 per month for the residential care of his son, who has significant disabilities, and that those expenses are reflected in his bankruptcy schedules. Id. at 24:2–25:2.

With the parties' agreement, the Court took judicial notice of Wilson's bankruptcy schedules, including amendments, and the order sustaining the Trustee's objection to exemption. The Court also inquired whether the Plaintiffs wished to conduct discovery concerning the completeness of Wilson's disclosures or possible manipulation of his financial affairs. Plaintiffs' counsel declined additional discovery, explaining that the estates did not wish to incur the associated expense. Id. at 40:4–10.

The hearing also addressed the status of the tort claims in the bankruptcy case. The Trustee's counsel confirmed that the Plaintiffs had filed Proof of Claim No. 1 in an unliquidated amount and that the claims bar date was June 18, 2026. Id. at 33:1–2. The parties acknowledged that the underlying claims remain disputed and that their allowance or liquidation may require further proceedings.

Although the Motion seeks dismissal under § 707(a), the Court also raised, sua sponte, the potential applicability of § 707(b). Specifically, the Court questioned whether the wrongful death and survival claims constitute "consumer debts" under 11 U.S.C. § 101(8), notwithstanding that the accident occurred during personal travel. The parties addressed that issue during the hearing, and the Court subsequently directed further consideration of the statutory classification of the claims. Id. at 19:3–22:4.

At the conclusion of the hearing, the Court took the Motion under advisement. The questions presented are whether the totality of the circumstances establishes cause for dismissal under § 707(a) and whether the statutory requirements of § 707(b) provide an alternative basis for dismissal.

## II. GOVERNING LEGAL PRINCIPLES

Section 707(a) of the Bankruptcy Code provides that a court may dismiss a Chapter 7 case, after notice and a hearing, only for cause. 11 U.S.C. § 707(a). The statute identifies three examples of cause: unreasonable delay by the debtor that is prejudicial to creditors, nonpayment of required fees and charges, and failure to file information required by § 521(a)(1). These examples are illustrative rather than exhaustive, and the determination of cause is not confined to the circumstances expressly enumerated in the statute. See 11 U.S.C. § 102(3).

In Tamecki v. Frank (In re Tamecki), 229 F.3d 205 (3d Cir. 2000), the Court of Appeals for the Third Circuit recognized that a debtor's lack of good faith may constitute cause for dismissal under § 707(a). The court explained that good faith requires, at a minimum, an honest intention in seeking bankruptcy relief and

that the determination of whether a debtor has abused the provisions, purpose, or spirit of the Bankruptcy Code must be made on an ad hoc basis. Id. at 207.

The inquiry is necessarily fact-intensive and requires consideration of the totality of the circumstances. Although Tamecki recognized that bad faith may warrant dismissal, it cautioned that such relief should not be undertaken lightly and generally should be reserved for egregious circumstances. Quoting Industrial Insurance Services, Inc. v. Zick (In re Zick), 931 F.2d 1124 (6th Cir. 1991), the court identified circumstances involving concealed or misrepresented assets or income, lavish lifestyles, and efforts to avoid substantial indebtedness accompanied by conduct akin to fraud, misconduct, or gross negligence. Tamecki, 229 F.3d at 207.

These considerations are not elements of a rigid test, nor must every circumstance be present before a court may find bad faith. Rather, they illustrate the types of conduct that may demonstrate an abuse of the bankruptcy process when considered in light of the debtor's financial condition, purpose in filing, and conduct before and during the bankruptcy case.

Tamecki also addressed the burden of establishing good faith. Although a debtor is not required to affirmatively demonstrate good faith merely by commencing a Chapter 7 case, once the party seeking dismissal produces evidence sufficient to place the debtor's good faith genuinely at issue, the burden shifts to the debtor to establish good faith. Id. at 207–08. The ultimate determination remains one committed to the Court's evaluation of the evidence and the circumstances presented.

The Third Circuit further examined the scope of § 707(a) in Perlin v. Hitachi Capital America Corp. (In re Perlin), 497 F.3d 364 (3d Cir. 2007). There, the court considered whether a debtor's substantial income and ability to repay creditors could support dismissal for lack of good faith when the debtor's obligations were not primarily consumer debts and § 707(b) therefore did not apply.

The court rejected the proposition that a debtor's financial circumstances must be disregarded when determining good faith under § 707(a). It held that substantial income, expenses, and repayment capacity are relevant considerations that may be evaluated together with other circumstances bearing upon the debtor's purpose in seeking bankruptcy relief. Id. at 372–75.

The court nevertheless imposed an important limitation upon the significance of those considerations. To avoid undermining the statutory distinction between §§ 707(a) and 707(b), Perlin held that a finding of bad faith may not be based "exclusively" or "primarily" upon a debtor's substantial financial means. Id. at 374. Accordingly, while repayment capacity is relevant to the totality-of-the-circumstances inquiry, it cannot independently furnish the controlling basis for dismissal under § 707(a).

In reaching that conclusion, the Third Circuit relied in part upon legislative history expressing concern that treating repayment capacity as sufficient cause for dismissal would effectively establish a judicially imposed, nonuniform mandatory Chapter 13. Id. at 372 (quoting H.R. Rep. No. 95–595, at 380 (1977)). The court therefore distinguished between considering financial means as

evidence relevant to good faith and employing those means as a substitute for the statutory standards governing access to Chapter 7.

Tamecki and Perlin must be read together. The former recognizes that a debtor's lack of good faith may constitute cause for dismissal, while the latter confirms that financial circumstances are relevant to that inquiry but limits the weight they may independently bear. Neither decision permits a court to disregard the totality of the circumstances or to treat any single consideration as automatically dispositive.

The Third Circuit has also examined good faith and legitimate bankruptcy purpose in the context of proceedings under other chapters of the Bankruptcy Code. In In re SGL Carbon Corp., 200 F.3d 154 (3d Cir. 1999), NMSBPCSLDHB, L.P. v. Integrated Telecom Express, Inc. (In re Integrated Telecom Express, Inc.), 384 F.3d 108 (3d Cir. 2004), and LTL Management, LLC v. Those Parties Listed on Appendix A to Complaint (In re LTL Management, LLC), 64 F.4th 84 (3d Cir. 2023), the court emphasized that a Chapter 11 petition must serve a legitimate bankruptcy purpose and that the debtor's financial condition is relevant to determining whether bankruptcy protection is warranted.

Those decisions arise under Chapter 11 and its distinct statutory objectives, including reorganization and the adjustment of creditor claims through a plan. They do not establish an identical financial-distress requirement for individual Chapter 7 debtors or displace the standards articulated in Tamecki and Perlin. Nevertheless, they reflect the broader principle that the availability

of bankruptcy relief does not eliminate the requirement that the process be invoked in good faith.

The good-faith inquiry may also consider whether bankruptcy has been employed principally to obtain an improper tactical advantage in pending litigation. See In re Myers, 491 F.3d 120, 125–27 (3d Cir. 2007). The existence of pending litigation, however, does not itself establish bad faith, particularly where the Bankruptcy Code expressly recognizes disputed, contingent, and unliquidated claims. See 11 U.S.C. § 101(5). The relevant question is whether the litigation-related circumstances, considered together with the remaining evidence, demonstrate an abuse of the bankruptcy process.

The separate provisions of § 707(b) establish additional grounds for dismissal or, with the debtor's consent, conversion of certain Chapter 7 cases. Unlike § 707(a), however, § 707(b) applies only to a case filed by an individual debtor whose debts are primarily consumer debts. 11 U.S.C. § 707(b)(1). The statutory definition of "consumer debt" is a debt incurred by an individual primarily for a personal, family, or household purpose. 11 U.S.C. § 101(8).

Where that threshold is satisfied, § 707(b)(2) establishes a means-test framework for determining whether a presumption of abuse arises, while § 707(b)(3) permits consideration of bad faith and the totality of the circumstances of the debtor's financial situation in cases where the presumption does not arise or has been rebutted. Both provisions remain subject to the consumer-debt limitation imposed by § 707(b)(1).

Accordingly, the Court must undertake two distinct inquiries. First, it must determine whether the totality of the circumstances establishes cause for dismissal under § 707(a), applying the controlling standards of Tamecki and Perlin. Second, because the Court has independently raised the potential applicability of § 707(b), it must determine whether Wilson's obligations are primarily consumer debts within the meaning of § 101(8) before considering whether the abuse provisions of § 707(b) may apply.

## III. ANALYSIS

### A. Dismissal Under § 707(a)

The Plaintiffs contend that Wilson commenced this Chapter 7 case in bad faith and that cause therefore exists for dismissal under § 707(a). They emphasize his substantial income, his ability to repay creditors, the limited number of creditors affected by the bankruptcy, and the proximity of his Petition to the scheduled trial of the wrongful death and survival actions. The Court agrees that these circumstances warrant scrutiny but concludes that dismissal is not permitted under the controlling principles established by the Court of Appeals.

The record presents an unusual Chapter 7 case. Wilson is an orthopedic surgeon with substantial earnings, meaningful assets, and few creditors. His financial difficulties do not arise from numerous unpaid obligations or an inability to meet ordinary living expenses. Rather, he faces potentially substantial liability arising from an automobile accident that resulted in two deaths. The principal economic consequence of his bankruptcy is that his

nonexempt assets will be administered for creditors while his future earnings generally remain beyond their reach. See 11 U.S.C. § 541(a)(6).

Wilson also filed his Petition approximately two months before the scheduled trial of the tort actions. H'rg Transcript 4:18–5:25. The filing stayed those proceedings, and the Plaintiffs understandably question why an individual with substantial income should be permitted to discharge potentially significant liabilities without committing future earnings toward their payment. Those concerns are legitimate, but they do not establish that Wilson commenced bankruptcy for an improper purpose.

The Plaintiffs' argument implicates a recurring concern in bankruptcy jurisprudence: whether bankruptcy should be available to resolve what is essentially a two-party dispute. Bankruptcy is fundamentally a collective proceeding, ordinarily designed to marshal assets, determine competing claims, and distribute value according to statutory priorities. Courts therefore have scrutinized petitions that appear to serve no purpose beyond obtaining a tactical advantage in litigation between a debtor and a single creditor.

In C-TC 9th Ave. P'ship v. Norton Co. (In re C-TC 9th Ave. P'ship), 113 F.3d 1304, 1311–12 (2d Cir. 1997), the Second Circuit affirmed dismissal of a Chapter 11 case that represented the continuation of a two-party dispute through bankruptcy. Similarly, in Wilk Auslander LLP v. Murray (In re Murray), 900 F.3d 53, 60–63 (2d Cir. 2018), the court affirmed dismissal of an involuntary Chapter 7 case in which a judgment creditor sought to employ bankruptcy as an alternative collection remedy. The Third Circuit expressed comparable concerns

in In re Forever Green Athletic Fields, Inc., 804 F.3d 328, 336–37 (3d Cir. 2015), recognizing that involuntary bankruptcy should not be used to obtain an improper advantage in private litigation.

An earlier decision from this District is particularly instructive. In In re Business Information Co., Inc., 81 B.R. 382 (Bankr. W.D. Pa. 1988), Judge Bernard Markovitz considered a Chapter 11 petition filed by a solvent corporation following an adverse judgment in employment litigation. The debtor had represented that it could satisfy the judgment but commenced bankruptcy after the judgment creditor attached its bank account. Judge Markovitz found substantial evidence of bad faith because the debtor appeared to be using the automatic stay as a substitute for obtaining a stay pending appeal. Although dismissal for cause under § 1112(b) was supportable, the court instead dismissed under § 305(a)(1). Id. at 385–87.

Importantly, Business Information also recognized that a single substantial judgment may legitimately precipitate bankruptcy when the liability threatens the debtor's financial existence. Id. at 385–86 (discussing In re Alton Telegraph Printing Co., 14 B.R. 238 (Bankr. S.D. Ill. 1981)). Thus, the significance of a two-party dispute depends upon the debtor's purpose in seeking relief, not merely the number of creditors involved.

That distinction is decisive here. Wilson is not attempting to relitigate an adverse judgment, evade the requirements for obtaining a stay pending appeal, or transfer the determination of negligence to a more favorable forum. No judgment establishing his liability had been entered when he filed bankruptcy.

Rather, Wilson seeks to address the financial consequences of potentially substantial tort liabilities through the liquidation and discharge provisions of Chapter 7. The fact that the automatic stay interrupted the state-court proceedings does not transform that legitimate bankruptcy objective into an improper litigation tactic.

Nor does the Bankruptcy Code impose a multiple-creditor requirement upon voluntary Chapter 7 relief. Congress expressly prescribed eligibility limitations in § 109, including restrictions based upon the nature of the debtor and, for certain chapters, the amount and character of indebtedness. See 11 U.S.C. §§ 109(b), (e), (f). Congress also addressed the number of petitioning creditors required to commence an involuntary bankruptcy case under § 303(b). Yet neither § 109 nor § 301 requires an individual seeking voluntary Chapter 7 relief to have more than one creditor. The Court declines to create an eligibility restriction that Congress did not enact.

The discharge provisions reinforce that conclusion. Congress generally permits the discharge of liabilities arising from ordinary negligence while excepting debts for willful and malicious injury under § 523(a)(6). See Kawaauhau v. Geiger, 523 U.S. 57, 61–64 (1998). A debtor facing potentially ruinous liability arising from a single automobile accident may therefore be precisely the individual for whom bankruptcy provides meaningful protection. It would be anomalous to conclude that Congress authorized the discharge of such liabilities but implicitly prohibited relief merely because they arise from one event or are asserted by a limited number of creditors.

Accordingly, the Court concludes that a two-party dispute warrants careful scrutiny but does not independently establish bad faith. The question remains whether the debtor is invoking bankruptcy to obtain relief authorized by the Code or employing it to accomplish an improper objective. On this record, Wilson seeks to address substantial potential liabilities, not to manipulate their adjudication. Moreover, the Chapter 7 Trustee is administering nonexempt assets for distribution to creditors, providing a genuine bankruptcy purpose beyond the interruption of litigation.

The more difficult question concerns Wilson's substantial financial means. His schedules reflect significant income, and his election of Chapter 7 permits him generally to retain postpetition earnings that might otherwise provide a meaningful source of repayment. The Plaintiffs contend that allowing such a debtor to obtain a discharge while preserving substantial future income is inconsistent with the good-faith requirement recognized in Tamecki and runs afoul of the purpose and spirit of bankruptcy.

In Perlin, the Third Circuit held that a debtor's substantial income and ability to repay creditors are relevant to determining good faith under § 707(a). The court nevertheless imposed a significant limitation, holding that a finding of bad faith may not rest exclusively or primarily upon the debtor's substantial financial means. Perlin, 497 F.3d at 374. That restriction is binding upon this Court.

Respectfully, the Court questions both the reasoning and the practical consequences of that limitation. A totality-of-the-circumstances inquiry

ordinarily requires a court to consider all relevant evidence and assign each circumstance the weight justified by the particular case. Perlin, however, declares one concededly relevant circumstance (i.e., substantial financial income or ability to repay) incapable of carrying primary weight, regardless of how extraordinary or compelling that evidence may be. The result is a curious form of judicial factfinding: the court may consider the evidence, but it may not allow that evidence to matter too much, even if the circumstances so compel.

The difficulty becomes apparent when the principle is tested against an extreme example. Suppose an individual earns several million dollars annually, maintains substantial disposable income, possesses ample assets, and faces a single substantial and threatening but otherwise dischargeable obligation. Suppose further that the individual has the present and reasonably foreseeable ability to satisfy that obligation without material financial hardship, yet elects Chapter 7 solely to preserve future earnings while obtaining a discharge. Under Perlin, the bankruptcy court may consider the debtor's extraordinary financial capacity, but it may not make that capacity the primary basis for finding bad faith. The more compelling the evidence of repayment ability becomes, the more conspicuous the limitation appears.

The Court recognizes that Chapter 7 contains no general insolvency requirement. It also recognizes that Congress has not expressly prohibited financially successful individuals from seeking liquidation relief. But those propositions do not necessarily answer whether extraordinary financial capacity may constitute cause for dismissal under § 707(a). Eligibility under § 109 and

good faith under § 707(a) are distinct inquiries. The fact that Congress has not imposed a categorical income limitation does not necessarily mean that a bankruptcy court must disregard extraordinary financial means when determining whether the debtor has invoked Chapter 7 in good faith.

Nor would permitting substantial financial means to constitute cause in an exceptional case necessarily establish a mandatory repayment requirement for all financially capable debtors. The distinction between a categorical rule and an individualized determination is fundamental. Section 707(a) expressly authorizes dismissal for cause, and the Third Circuit has recognized that bad faith may constitute such cause. An individualized finding that extraordinary repayment capacity renders a particular Chapter 7 filing abusive would not necessarily require every debtor with disposable income to pursue a repayment chapter. Instead, an individualized finding would fall squarely within the ad hoc nature of good-faith inquiry.

The structure of the Bankruptcy Code makes the restriction particularly difficult to justify. Congress established Chapters 11, 12, and 13 as mechanisms through which eligible individual debtors may adjust their obligations while committing future income toward creditor repayment. See 11 U.S.C. §§ 1129(a)(15), 1225(b), 1325(b). Chapter 7 serves a different purpose: the liquidation of nonexempt assets followed, ordinarily, by a discharge, while compensation for postpetition personal services generally remains outside the estate. See 11 U.S.C. §§ 541(a)(6), 727. The availability of those distinct forms of relief does not mean that a debtor must always select the chapter producing the

greatest creditor recovery, but the choice may bear directly upon whether the debtor is invoking bankruptcy in good faith.

In an egregious case, the Court sees no principled reason why extraordinary income, substantial disposable earnings, and an overwhelming ability to repay creditors should be incapable of constituting the primary basis for dismissal. A debtor who possesses abundant resources to satisfy existing obligations but chooses Chapter 7 solely to avoid using those resources presents a question of bankruptcy purpose, not merely financial eligibility. The good-faith inquiry should be sufficiently flexible to address that circumstance without requiring independent evidence of fraud, concealment, extravagant spending, or other misconduct.

Indeed, Perlin risks producing the opposite result. By prohibiting substantial financial means from serving as the primary basis for dismissal, it may effectively require proof of some additional form of misconduct before a financially capable debtor can be denied Chapter 7 relief. Yet bad faith and fraud are not synonymous, and a debtor may seek an otherwise available statutory remedy for a purpose inconsistent with its legitimate function without concealing assets or making false statements. The absence of dishonesty should be important evidence, but it should not necessarily end the inquiry.

The Court also questions whether Perlin is readily reconciled with the Third Circuit's subsequent emphasis upon legitimate bankruptcy purpose and financial distress in Chapter 11. In LTL Management, the Court of Appeals considered the debtor's access to substantial financial resources in determining

whether Chapter 11 relief was justified. See also SGL Carbon, 200 F.3d at 166; Integrated Telecom, 384 F.3d at 120–21. Those decisions arise under Chapter 11 and do not establish an insolvency or financial-distress prerequisite for Chapter 7. Nevertheless, they recognize that the debtor's financial condition may be central (and not merely incidental) to determining whether bankruptcy serves a legitimate purpose.

The Court nevertheless appreciates the statutory distinction underlying Perlin. Section 707(b) establishes an abuse framework for individual debtors whose obligations are primarily consumer debts, and Congress did not extend that framework to debtors whose obligations are primarily nonconsumer debts. The Court therefore must not employ § 707(a) simply to replicate the means test Congress confined to consumer cases. But recognizing that limitation does not require the further conclusion that extraordinary repayment capacity can never be the predominant evidence of bad faith. Section 707(a) addresses cause for dismissal; § 707(b) addresses a separately defined statutory form of abuse. The provisions should not be conflated, but neither should one be interpreted to deprive the other of its independent operation.

The Supreme Court has long described bankruptcy as providing a fresh start to the "honest but unfortunate debtor." Local Loan Co. v. Hunt, 292 U.S. 234, 244 (1934). That formulation does not establish an independent insolvency requirement or authorize courts to disregard the text of the Bankruptcy Code. It does, however, reflect the fundamental purpose of discharge relief: protecting individuals from the oppressive consequences of indebtedness, rather than

furnishing an unrestricted opportunity to retain extraordinary financial resources while shifting avoidable losses to creditors. Cf. In re Tomco, 339 B.R. 145 (Bankr. W.D. Pa. 2006) (discussing how one of the purposes and effects of BAPCPA was to establish bankruptcy as a remedy of last resort, rather than first resort, for the honest but unfortunate debtor) (citing H.R. Rep. No. 109-31, at 4 (2005)).

The Court therefore respectfully suggests that Perlin deserves reconsideration in an appropriate case. A more coherent approach would permit substantial financial means to assume whatever weight the evidence warrants, including decisive weight in an exceptional case, while requiring the bankruptcy court to explain why those circumstances demonstrate bad faith rather than merely the debtor's financial success. Such an approach would preserve individualized review, respect the absence of a statutory insolvency requirement, and avoid converting § 707(a) into a mechanical means test.

Whatever the merits of that approach, this Court remains bound by Perlin. It must therefore evaluate Wilson's financial capacity as part of the totality of the circumstances without making that capacity the exclusive or primary basis for dismissal.

The admissions of record concerning Wilson's conduct weighs against a finding of bad faith. The Trustee's counsel confirmed that Wilson was honest and forthcoming at the meeting of creditors, and Wilson has cooperated in the administration of nonexempt assets, including an account valued at approximately $108,000 that he initially claimed exempt. H'rg Transcript 39:25–

40:3. Although the Plaintiffs identified omissions from his original schedules, the record does not establish intentional concealment, fraudulent transfers, manipulation of expenses, or an extravagant lifestyle.

At the hearing, the Court asked Plaintiffs' counsel a series of questions regarding the omissions and amendments to the schedules and disclosures. Plaintiffs' counsel expressed no concern for the possible concealment of income, manipulation of financial affairs, artificial inflation of expenses, diversion of funds, or the continuation of an extravagant lifestyle. Id. at 39:4–41:1. Plaintiffs' counsel did however suggest that the values of Wilson's bank accounts appear to be low relative to his monthly income, and further that the amendments to the statement of financial affairs may be suggestive of less than honest disclosure. Id. at 39:10–43:3. Nevertheless, Plaintiffs declined the opportunity to conduct additional discovery concerning Wilson's financial affairs. Id.

Wilson's substantial earnings must be considered alongside his circumstances. He is approximately sixty years old, practices a physically demanding profession, and incurs significant expenses associated with his son's residential care. Although his present income is substantial, the record does not establish that he can sustain that income indefinitely or that his capacity to satisfy a potentially seven-figure judgment is assured. The Court cannot equate substantial current earnings with unlimited future repayment capacity.

The Court also gives weight to the nature of Wilson's potential liabilities. He faces substantial disputed tort claims arising from a single accident, and no judgment establishing his responsibility has been entered. His decision to

address those liabilities through Chapter 7 is not inherently improper, particularly where the Bankruptcy Code contemplates the discharge of eligible negligence claims and the Trustee is administering assets for creditor distribution.

Under Tamecki, the circumstances surrounding Wilson's Petition sufficiently call his good faith into question, requiring him to establish that he invoked bankruptcy for a legitimate purpose. The Court concludes that he has satisfied that burden. His cooperation with the Trustee, surrender of nonexempt assets, absence of demonstrated misconduct, and exposure to substantial disputed liabilities support a finding of good faith notwithstanding the timing of the filing and the concentration of indebtedness.

The possibility that Wilson could devote future earnings toward repayment rather than obtain a Chapter 7 discharge is concerning. That concern is significant, but under Perlin it cannot serve as the exclusive or primary basis for dismissal. The Court therefore concludes that cause for dismissal under § 707(a) has not been established.

The result is compelled by controlling precedent, although the Court remains troubled by the limitation Perlin places upon the good-faith inquiry. In an appropriate case involving extraordinary income and an overwhelming ability to repay creditors, particularly where the scope of the creditor universe suggests no immediate financial distress, substantial financial means alone should be capable of supporting dismissal for bad faith when the evidence establishes that Chapter 7 is being invoked for an abusive purpose. Whether the Third Circuit

will reconsider Perlin is for that court to determine. Until then, this Court must apply its holding, and the Plaintiffs' request for dismissal under § 707(a) must be denied.

### B. Dismissal Under Section 707(b), the Means Test, and the Meaning of "Consumer Debt"

The Plaintiffs' emphasis upon Wilson's substantial income and apparent ability to repay his creditors raises a question distinct from the good-faith inquiry under § 707(a). Congress addressed repayment capacity in § 707(b), which authorizes dismissal of certain Chapter 7 cases for abuse, establishes a means-test presumption, and permits consideration of bad faith and the totality of the debtor's financial circumstances. 11 U.S.C. § 707(b)(1)–(3). But Congress expressly limited those provisions to an individual debtor "whose debts are primarily consumer debts." 11 U.S.C. § 707(b)(1). Whether Wilson is subject to § 707(b) therefore turns upon the character of his obligations, particularly the wrongful death and survival claims arising from the automobile accident.

Section 101(8) defines "consumer debt" as a "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. § 101(8). The Code separately defines "debt" as "liability on a claim," § 101(12), and "claim" to include a right to payment regardless of whether it is contingent, disputed, unliquidated, or reduced to judgment, § 101(5)(A). Thus, the absence of a judgment in the underlying state-court litigation does not prevent the Plaintiffs' claims from constituting debts for bankruptcy purposes. The question is whether those debts were incurred primarily for a personal, family, or household purpose.

The Plaintiffs contend that the purpose of Wilson's conduct determines the character of the resulting obligations. *Supplemental Brief in Support of Motion to Dismiss Case Pursuant to 11 U.S.C. § 707(a)*, ECF No. 71 at ECF pgs. 7–10. They emphasize that Wilson was traveling to visit his severely disabled son at a residential care facility, an activity undertaken for an unquestionably personal and family purpose. Id. at 9. Wilson responds that the statutory inquiry concerns the purpose for which the debt was incurred, rather than merely the purpose of the activity during which liability arose. *Reply of the Debtor David B. Wilson to the Supplemental Brief of the Movants in Support of the Motion to Dismiss*, ECF No. 72 at ECF pgs. 3–5. Under his interpretation, the alleged tort obligations do not become consumer debts simply because the accident occurred during a family visit. Id.

The Court begins with the statutory language. The term "incur" ordinarily means to become liable or subject to an obligation, and does not necessarily imply that the obligation was voluntarily assumed. See In re White, 49 B.R. 869, 872 (Bankr. W.D.N.C. 1985) (discussing the meaning of "incur" by reference to *Webster's New Collegiate Dictionary* (1958)). Congress did not expressly limit § 101(8) to contractual obligations, extensions of credit, or liabilities voluntarily undertaken. The Court therefore declines to adopt a categorical rule excluding obligations imposed by law from the definition of consumer debt.

In this respect, the Court questions the reasoning of Internal Revenue Service v. Westberry (In re Westberry), 215 F.3d 589 (6th Cir. 2000). Addressing the Chapter 13 codebtor stay under § 1301, the Sixth Circuit held that federal

income and self-employment taxes were not consumer debts, emphasizing their involuntary character, the public purposes of taxation, and the distinction between earning income and consuming it. Id. at 591–93. Those considerations may inform the analysis, but none is expressly incorporated into § 101(8). An individual who deliberately earns wages to support a family engages in conduct that predictably produces income-tax liability, and the fact that the obligation is imposed by statute does not, standing alone, establish that it lacks a personal or family purpose. Whether such taxes ultimately qualify as consumer debts is not before this Court, and the Court expresses no holding on that question.

Intentional torts provide another illustration of the question of volition. Consider an individual who, during a personal dispute, deliberately clenches a fist, aims at another person's nose, and strikes it. The actor intends the harmful contact, and the resulting injury is the very consequence the conduct was calculated to produce. The obligation to compensate the injured person follows directly from that intentional act. There is a substantial argument that the resulting debt was incurred for a personal purpose, even though the law, rather than an agreement, imposes the obligation to pay damages.

The contrary conclusion cannot rest simply upon the proposition that the actor did not intend to become indebted. Section 101(8) does not expressly require an intention to pay damages, any more than it requires an intention to pay taxes. What matters is the relationship between the purpose of the conduct creating the liability and the resulting obligation. The battery example presents a particularly direct relationship because the intended harmful contact is itself

the basis for liability. The Court need not decide whether such a debt is consumer debt, but the example demonstrates why the involuntary character of a tort obligation cannot be dispositive.

An automobile accident caused by ordinary negligence presents a materially different circumstance. Although the driver intentionally operates the automobile, the collision and resulting injuries are not undertaken to accomplish the purpose of the journey. The obligation to compensate the victims arises from an unintended consequence of the driver's conduct, rather than from conduct calculated to produce the injury. This distinction does not establish that every intentional tort produces consumer debt or that every negligent tort produces nonconsumer debt. It does, however, demonstrate the relational nature of the definition—why it is the relationship between the debtor's objective and the conduct creating liability that matters under § 101(8).

The most closely analogous decision is In re White, 49 B.R. 869 (Bankr. W.D.N.C. 1985). There, the debtor negligently caused an automobile accident while returning from a grocery store, resulting in a substantial personal-injury judgment. The creditor argued that the judgment constituted consumer debt because the debtor had been driving for a personal purpose. The bankruptcy court rejected that argument, distinguishing between an obligation incurred to accomplish a personal objective, such as purchasing gasoline for transportation, and liability imposed because negligent conduct injured another person. Id. at 872. The court concluded that the accident liability arose incidentally to the personal activity rather than primarily to accomplish its objective.

The Court finds that distinction persuasive, without adopting any categorical requirement that consumer debts must be voluntarily incurred. The debtor in White intended to travel for personal reasons but did not intend to cause an accident or injure another person. The resulting liability did not facilitate or accomplish the personal errand; it arose because the law imposed consequences upon *negligent* conduct. The personal character of the journey therefore did not establish that the resulting obligation was incurred primarily for a personal purpose.

Wilson's circumstances are materially similar. His trip to visit his son unquestionably served a family purpose, but the record does not establish that he intended to cause the accident or injure anyone. Expenses incurred for gasoline or transportation would ordinarily be consumer debts because they were undertaken to accomplish the family visit. The alleged wrongful death and survival liabilities, however, arose from the unintended consequences of operating the automobile, not from an obligation incurred to accomplish the visit itself. The family purpose of the journey does not transform those liabilities into consumer debts.

Other authorities support the conclusion that a debt does not become consumer debt simply because it lacks a business purpose. In In re Marshalek, 158 B.R. 704, 706–08 (Bankr. N.D. Ohio 1993), the court treated automobile-accident judgments as nonconsumer debts and rejected the proposition that the absence of a profit motive necessarily establishes a consumer purpose. Likewise, In re Peterson, 524 B.R. 808, 812–13 (Bankr. S.D. Ind. 2015), recognized that

some obligations occupy an intermediate or interstitial category, being neither consumer nor business debts. The Court agrees that the statutory definition permits such a category, although it does not adopt Marshalek's suggestion that voluntariness is essential to consumer-debt classification.

Congress defined consumer debt affirmatively as debt incurred primarily for a personal, family, or household purpose. 11 U.S.C. § 101(8). It did not define consumer debt as every obligation incurred without a profit motive. See Westberry, 215 F.3d at 593–94 (explaining that the absence of a profit motive does not necessarily make an obligation consumer debt); Marshalek, 158 B.R. at 706. Accordingly, the fact that Wilson's alleged liabilities did not arise from his medical practice or another commercial activity does not establish that they were incurred for a consumer purpose.

The Court recognizes that other decisions have construed the statutory definition more broadly. In Kestell v. Kestell (In re Kestell), 99 F.3d 146, 149 (4th Cir. 1996), the Fourth Circuit treated an obligation arising from a divorce judgment as consumer debt because it was not incurred with a profit motive or in connection with a business transaction. But an obligation arising directly from a domestic relationship differs from liability imposed for negligently injuring an unrelated third party. Moreover, Cypher Chiropractic Center v. Runski (In re Runski), 102 F.3d 744, 746–47 (4th Cir. 1996), concerned whether equipment used in a chiropractic practice, but held only in the debtor's individual name qualified as property held for personal, family, or household use under § 722. The court held that it did not. Both cases examine motive and purpose but

neither decision resolves whether liability arising from an unintended automobile accident constitutes consumer debt under § 101(8).

The analysis in In re Durant, 586 B.R. 212 (Bankr. D. Md. 2018) is also instructive. There, the court examined a judgment arising from the debtor's misuse of his son's inheritance and concluded that compensatory obligations associated with funds used for personal expenditures constituted consumer debt, while punitive damages did not. Id. at 218–23. The decision illustrates that neither the entry of a judgment nor the wrongful character of the underlying conduct necessarily determines whether the resulting obligation is consumer debt. Rather, the purpose of the underlying obligation and its relationship to the resulting liability remains central to the inquiry.

The legislative history provides additional context. The definition of consumer debt was adapted from terminology employed in consumer-protection legislation, which generally distinguishes transactions involving personal, family, or household purposes from commercial undertakings. See S. Rep. No. 95-989, at 22 (1978); In re Booth, 858 F.2d 1051, 1054–55 (5th Cir. 1988); Westberry, 215 F.3d at 594. That history does not justify importing a contractual or voluntariness requirement into § 101(8), but it supports examining whether the obligation bears a meaningful relationship to the personal objective it allegedly served.

The Court therefore concludes that the Plaintiffs' wrongful death and survival claims are not consumer debts within the meaning of § 101(8). This holding does not depend upon a categorical exclusion of tort liabilities or

obligations imposed by law. It rests upon the narrower determination that the alleged liabilities arose from unintended injuries caused during a personal journey, rather than from conduct undertaken to produce those injuries or an obligation incurred to accomplish the journey's family purpose.

The remaining question is whether Wilson's debts are primarily consumer debts when considered in the aggregate. Courts generally examine the relative dollar amounts of consumer and nonconsumer obligations, with consumer debts ordinarily required to exceed one-half of the debtor's total indebtedness. See Booth, 858 F.2d at 1055; Zolg v. Kelly (In re Kelly), 841 F.2d 908, 913 (9th Cir. 1988). The Plaintiffs' claims remain disputed and unliquidated, but that does not exclude them from the calculation. See 11 U.S.C. §§ 101(5), (12). Their appropriate valuation must be considered alongside Wilson's remaining obligations, including secured indebtedness, before the Court can determine whether the statutory threshold has been satisfied.

The record establishes that Wilson's nonconsumer obligations predominate inasmuch as the tort obligations dwarf the remaining claim(s) against him. Thus, § 707(b) does not apply. That conclusion renders both the means-test presumption under § 707(b)(2) and the separate abuse inquiries under § 707(b)(3) unavailable as grounds for dismissal. The Plaintiffs' request therefore remains governed by § 707(a) and the controlling decisions of the Third Circuit.

The consequences of this statutory distinction are substantial. Congress enacted the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005

("BAPCPA") in part to address concerns that financially capable debtors were obtaining Chapter 7 relief without adequately accounting for their ability to repay creditors. See Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, § 102, 119 Stat. 23, 27–32 (amending § 707(b)). Congress strengthened the abuse provisions and established the means test, but retained the limitation restricting § 707(b) to debtors whose obligations are primarily consumer debts. The result is a statutory framework that subjects some financially capable debtors to repayment-capacity scrutiny while excluding others based upon the character of their obligations.

Consider two physicians with comparable incomes, assets, expenses, and repayment capacities. One accumulates substantial medical bills, credit-card obligations, or other debts incurred to meet ordinary personal and family needs. That individual may face dismissal under § 707(b), notwithstanding that the obligations were incurred honestly and without misconduct. The other physician incurs substantially greater liability through an automobile accident causing catastrophic injury or death. If those obligations are nonconsumer debts, the second physician is not subject to § 707(b), regardless of the physician's financial ability to compensate the injured parties.

The distinction becomes particularly significant when considered alongside Perlin. Under Perlin, a debtor's substantial financial means may be considered in evaluating good faith under § 707(a), but an ultimate finding of bad faith may not rest exclusively or primarily upon those financial means. 497 F.3d at 374. Thus, although § 707(a) remains available to address misconduct

and other circumstances constituting cause for dismissal, it does not provide an unrestricted alternative to the repayment-capacity analysis prescribed by § 707(b). A debtor whose obligations are predominantly nonconsumer may therefore obtain Chapter 7 relief despite substantial repayment capacity, while an otherwise similarly situated consumer debtor may be denied that relief.

The Court finds this distinction difficult to reconcile with BAPCPA's ubiquitous emphasis upon repayment capacity. Why should an individual overwhelmed by medical bills or ordinary household expenses face greater scrutiny of the ability to repay than an individual whose substantial liabilities arise from negligent conduct undertaken in a personal capacity? The question is especially troubling where the latter obligations arise not from a failed business venture, but from an automobile accident resulting in the loss of human life. The Court perceives no readily apparent policy justification for treating financially identical individuals so differently merely because their debts arose under different circumstances.

The Court does not suggest that negligence establishes dishonesty or that individuals facing substantial tort liabilities are categorically less deserving of bankruptcy relief. Nor does the Court overlook the Bankruptcy Code's longstanding commitment to providing a fresh start to the honest but unfortunate debtor. See Local Loan Co., 292 U.S. at 244; Marrama v. Citizens Bank of Massachusetts, 549 U.S. 365, 367 (2007). Indeed, as the Court has already determined in addressing the Plaintiffs' request for dismissal under § 707(a), Wilson's financial circumstances and the other evidence presented do

not establish cause for dismissal under the governing law. That determination, however, does not eliminate the broader question of whether Congress intended financially capable individuals with predominantly nonconsumer debts to receive materially different treatment from those whose obligations are primarily consumer in nature.

The Court recognizes that this disparity is a consequence of the statutory framework Congress enacted. Section 707(b) expressly applies only to debtors whose obligations are primarily consumer debts, and Perlin remains binding precedent governing the significance of repayment capacity under § 707(a). The Court cannot disregard either limitation merely because their combined effect produces results that appear difficult to justify as a matter of policy. Nor may the Court transform § 707(a) into an alternative means test when Congress has chosen not to subject nonconsumer debtors to § 707(b). The Court's responsibility is to apply the law as written, not to revise it.

Nevertheless, the circumstances presented here warrant congressional consideration. Congress may wish to examine whether the repayment-capacity provisions of § 707(b) should remain confined to consumer debtors or whether financially capable individuals with predominantly nonconsumer obligations should be subject to comparable scrutiny. Any such reform would necessarily require safeguards preserving the fresh-start policy and assurance that substantial income, standing alone, does not become synonymous with bad faith. Those are legislative judgments, and the Court expresses no view concerning the precise form any amendment should take.

The parties, their counsel, and others concerned with the administration of the bankruptcy system may bring this apparent disparity to the attention of their congressional representatives. Congress is best positioned to determine whether the distinction continues to serve a legitimate purpose or whether the Bankruptcy Code should be amended to provide more consistent treatment of financially capable individuals. Until Congress acts, the Court must respect the statutory distinction, notwithstanding its reservations about the consequences.

Accordingly, because the record establishes that Wilson's obligations are not primarily consumer debts, § 707(b) provides no basis for dismissing his Chapter 7 case. The Plaintiffs' request for dismissal under that provision is therefore denied. This conclusion is consistent with, but analytically distinct from, the Court's preceding determination that the Plaintiffs failed to establish cause for dismissal under § 707(a). Neither provision authorizes the Court to dismiss Wilson's case on the record presented, and the Court declines to impose a repayment-capacity requirement that Congress has not made applicable to this debtor.

## IV. CONCLUSION

The Court does not reach this decision without substantial reservations. The Plaintiffs have suffered losses of a magnitude that no judicial decision can undo. The Court recognizes the profound grief occasioned by the deaths of their loved ones and deeply regrets that the law affords this Court no means to restore what has been taken from them or to provide the relief they seek in this proceeding.

Were this Court entrusted with the powerful pen to rewrite the law, it would not hesitate to address the inequities illuminated by this case. But that pen belongs to Congress, not the judiciary. A court's duty is not to dispense the justice it might prefer, but to administer the law it is bound to apply, even when the result is deeply unsatisfying. Judicial authority is defined as much by its limitations as by its powers.

Accordingly, and with the reservations expressed herein, the Court will enter a separate Order denying the Plaintiffs' Motion. The Court does so not because it is indifferent to the Plaintiffs' suffering or the gravity of their claims, but because fidelity to the law requires no less.

Dated: November 19, 2026

jsf

Jeffery A. Deller
United States Bankruptcy Judge

Case Administrator to Mail to:

Kathryn L. Harrison, Esq.
Brent Lemon, Esq.
Lisa Swope, Esq., Chapter 7 Trustee
Kevin Petak, Esq.
Office of the United States Trustee